24-1249 Northern Iowa, United States v. Kevon Spratt Mr. Roth, the court notes you were appointed under the Criminal Justice Act and we appreciate your assistance. Yes, sir. May it please the court, Mr. Fairchild, good morning and thank you, your honors, for allowing me to argue this case on behalf of my client, Mr. Spratt. There are several issues briefed in this case. I don't know if we'll be able to touch on all of them, but I do want to start with the Fourth Amendment issue in the case. Mr. Spratt had filed a motion to suppress evidence seized from his vehicle after a traffic stop initiated by Officer Tischer with the Sioux City Police Department on November 14, 2022. Mr. Spratt's motion was denied by the magistrate and upheld without modification by the district judge. In this case, the government and the district court relied on the collective knowledge doctrine to support the stop. In fact, the government's presentation of evidence of the suppression hearing, as well as its brief, focused a lot more heavily on the officers that did not stop Mr. Spratt. And as I'll cover here in a minute, the proper focus, we believe, is on the stopping officer, that Officer Tischer. Because we believe this case goes beyond the limits of what the collective knowledge doctrine allows. Let me ask you, counsel, why do you think that Officer Tischer didn't have enough information to make the stop? I mean, wasn't he a member of the police department? And it seems to me there's some evidence, at least in the record, that he had quite a deal of information. Yes, sir. And so, you know, focusing on what Officer Tischer knew at the time, essentially what was communicated to him, because he had received this call that there's this robbery that day. Prior to that day, he had received some information regarding a vehicle involved in other robberies. By the way, I'm sorry to interrupt, but this question may have a broader aspect than that is I'm not so sure that it's really a question of collective knowledge if Tischer himself had knowledge that was communicated to him, but that counts. It's not really a matter of putting Officer A's knowledge together with B's and coming up with some C probable cause, right? I mean, here, so if you just, as you will, as you're doing, please just focus on what Mr. Tischer knew. Sure. And I agree, Your Honor, that the focus should be on what Officer Tischer knew. And it's our contention he did not know enough and did not have that probable cause to stop Mr. Spratt. I mean, to start with, Officer Tischer wasn't sure. There was testimony at the suppression hearing that he had put out a call to his supervisor about whether he could in fact stop Mr. Spratt. There was also a question at the suppression hearing, was he even trying to stop Mr. Spratt? He had his lights and sirens on and he said he wasn't trying to stop Mr. Spratt, but, you know, because the lights and sirens were on, Mr. Spratt pulled over and Officer Tischer decided, oh, well, let's go ahead and stop Mr. Spratt. The things he knew was, again, there's a possible vehicle from the Sioux City robberies in the area. And then there was also the Salix robbery. But there's no information from the Salix robbery. He also knew none of the other vehicles in the, as the government describes, the cavalcade of police were trying to stop Mr. Spratt at that time. We believe it's also important to note what Officer Tischer did not know. He did not know who the driver was of that vehicle. I'm sorry, he did not know what? He did not know who the driver was of that vehicle. What do you mean by he didn't know who he was? Well, the information they had from the Sioux City. He was focused on the car. Yes, Your Honor. Because there's prior information about the car. That's correct, Your Honor. Yeah. He had the prior information about the car. There was no information about the driver. But there was also no information at that time that that car, the silver sedan, was involved in the robbery happening that day. He testified later during his cross-examination. That information came later after the stop. And so, with the collective knowledge doctrine, again, I understand we're looking at Officer Tischer and I agree that's the proper focus. However, the district court did decide the motion on that basis. It is something the government's arguing. When looking at the collective knowledge doctrine, you have to look at whether there's this, some degree of communication. Well, let me, before we go to that point, it seems to me there's evidence in the record that Fischer was a SCPD officer who for days had received reports about the suspect. Isn't that true? That's correct, Your Honor. He also knew that the driver of the vehicle was suspected of other robberies. Yes, Your Honor. He knew. So, I mean, I don't know. He knew the driver of a similar vehicle was. Well, yeah, okay. Okay. Yeah, all right. And that the car in question was silver with a black top. He knew that, right? Yes, Your Honor. Okay. So, I mean, there was absolutely some degree of communication, therefore, between Tischer and the other officers. Your Honor, again, I think when looking at Officer Tischer, we agree there is communication. Now, we don't agree there is enough communication to meet that threshold in this case to show the collective knowledge doctrine would apply to save the stop. Okay. I know in the government's brief, they kind of go a step further and argue the distinction really depends on whether, you know, the officers were all part of this one search team or whether they were kind of independently the crime. And even looking at that distinction, we would argue, you know, the collective knowledge doctrine would not apply. In this case, you know, officers were there. They were looking for this car, but they were all kind of independent of each other. There were multiple agencies. There is evidence in the record these agencies actually could not communicate because of the different channels they were on. And also, there's, you know, officers within the agencies not communicating before the time of that stop. Again, Officer Fleckenstein didn't get this information to Tischer before the stop. I know that, again, the government's arguments could be these other officers knew enough. It seems to me a lot of collective knowledge cases involve alerts from a general dispatch place of information gathered by people who are not working directly with the recipient of the alert who then acts on it. And that is part of the collective knowledge doctrine, isn't it? That's correct. That's part of it. And again, I think it goes into this, you know, whole white swath of information about whether there is enough knowledge that was conveyed to that officer. And I agree, there was alerts that other officers had. I know the government had mentioned, you know, officers from other agencies like Boettcher thought he had reasonable suspicion. Rosendahl thought he saw a traffic violation. But these are all things that were never communicated to Officer Tischer from that day. And so, apart from the collective knowledge doctrine, I know that the government's second argument to try and save the stop is that there would have been inevitable discovery of the items found in the car. It is our contention that that's wrong and that the inevitable discovery doctrine does not apply in this case. For the inevitable discovery doctrine to apply, there has to be those two prongs. The government must have been actively pursuing an alternate line of investigation and they must show the evidence would have been discovered through that alternate line of investigation. As far as the first prong goes, we believe there's no alternate line of investigation. There was evidence adduced at the suppression hearing that Detective Sitzman had started that search warrant. However, he didn't finish that search warrant until after the stop. I know at the suppression hearing, the government had gone through that warrant with him to say, you know, this is information we're crossing on this paragraph of things you learned after the stop. However, you know, if you look through that Exhibit 2 from the suppression hearing, there are other paragraphs that clearly were written after this traffic stop. So... Was there a version of it that he could present, what it looked like at the time he was saying he was preparing, excuse me, for purposes of the inevitable discovery? Yes, there was essentially a version that he had marked up at the suppression hearing that crossed off, hey, this is what I learned after the stop. Again, it's our contention that we somewhat disagree with that because if you read that Exhibit 2, the context clues from a couple other paragraphs also show the warrant was completed after the stop. But essentially, the point here is apart from what the actual substance of information is, it shows that that warrant was all part of one line of investigation that included the stop. Second, the question is, would the evidence have been inevitably discovered? And again, it's our contention that there's no evidence the items would have still been discovered if they waited on the warrant to be completed. Now, you know, Detective Sitzman completed that warrant shortly after the stop. Again, I think it's reasonable to infer that that traffic stop probably put him into action to get that warrant completed as soon as possible to get that car searched. So we believe the Ineligible Discovery Doctrine would not apply in this case. Our next issue I do want to touch upon is a motion to dismiss that was filed by Mr. Spratt prior to trial. He had filed a motion to dismiss Count 8 of the indictment, I'm sorry, the second superseding indictment that had to do with using or carrying a firearm during interrelation to a crime of violence. And of course, that Count 8 depends on the prior count, the Count 7 that would have been the attempted bank robbery charge. Our contention is that that attempted bank robbery charge is not a crime of violence that could support that Count 8. And again, looking to the statutory language in Title 18 U.S. Code, Section 2113a. I didn't understand your argument because the conjunctive disjunctive doctrine is well established. Why doesn't that apply? Yes, Your Honor. I guess prior or before getting to that doctrine as far as what the actual language was in the indictment, I think just looking at a pure reading of the statute, the statutory language, you know, the force and violence or by intimidation and just purely looking at that statute, we believe that Taylor would apply in this case. And that's the statute that had to do with the Hobbs Act robbery. So again, to find Mr. Spratt guilty, the jury would have to find that he used force in that Count 7. But again, it's argument that Taylor would apply here even though it deals with that. How does that support a motion to dismiss the indictment? Well, to that Count 8, Your Honor, because Count 8 was charged as the use of a firearm in relation to the crime of violence. And so the argument is that, you know, that Count 7 wasn't a crime of violence. So Count 8 could not be a charged crime because Taylor would apply in this case. Because as soon as you're looking at, you know, the statutory language, the force and violence or intimidation, it was the contention at the motion dismiss hearing that that intimidation would not include force. What you did was move to dismiss one of the charges. Yes, Your Honor. The request was to dismiss just that Count 8. That was the only charge that you were asking to dismiss. Yes, Your Honor. Not the indictment, but the firearm. Correct. Yes, Your Honor. Maybe I misspoke earlier, but that was essentially the motion to dismiss was Count 8 of the indictment. I see a minute of my rebuttal time. I'd like to save the rest of my time for rebuttal. Thank you, Your Honors. Mr. Fairchild. May it please the Court. Counsel, good morning. My name is Ford Fairchild. I represent the United States of America in this matter. To begin with the traffic stop, it is crucial to remember that Tischer's testimony at the suppression hearing reveals that before the November 14th attempted robbery in Salix, he already was tracking the information being gathered by officers, citizens of the Sioux City Police Department and others. So he knew of those three other suspected robberies before the Salix robbery. So law enforcement had probable cause to believe that the defendant had committed those other robberies before the attempted Salix robbery. If you want to take a look at the suppression hearing, pages 5 through 22, 77 through 78, there's a nice summary of that. That information had been communicated by Sitzman and other members of the local law enforcement to a variety of agencies. Not just within Sioux City PD, but broader to the Woodbury County Sheriff's Office, to the Sergeant Buff Police Department. There's even mention of discussion of this with officers of the South Sioux City, Nebraska Police Department. This information being communicated, again, 9 through 13 gives you an idea of that in the suppression hearing. And the name Fleckenstein is specifically mentioned at page 13. So these facts are being communicated to the wider law enforcement community, including Mr. Tischer, Officer Tischer. The only reason that the defendant is not arrested before the 14th is a tactical one. Is what? Is a tactical one. Officer Sitzman wants to study his pattern of life, so when he writes that warrant, he not only can search the person and the car, but also the landing spot, as he calls it. That's the tactical decision that causes the delay. That tactical decision, obviously, is obviated by the defendant's attempted robbery in Salix. At that point, though, they still have the probable cause that's previously been acquired for the previously committed robberies. Then what happens? Because of this information, acquired and shared, law enforcement positioned themselves between where the bank robbery just happened, the attempted bank robbery just happened, and where Mr. Spratt lived, the general neighborhood. There was testimony in the suppression record. There were two routes home. Officers positioned themselves on both, and lo and behold, what do they see? They see a car that looks like Mr. Spratt's, and then they confirm it's Mr. Spratt's, and then the stop follows from that. But, though, Tischer is the one who does the stop, and he's not even sure if he's stopping him as lights go on, and he has to ask whether it's okay. How does that factor? He's not confident, at least at that point, that he has probable cause to pull him over. I disagree, Your Honor. I think he's not confident whether or not the tactical hold to not hold him over, if that's been overcome. Tischer understands that the defendant is a suspect in the three previous robberies, and then Tischer is being, not only does he know that, he also testifies that Fleckenstein communicated what was happening that day. So, Tischer's reluctance to pull over the defendant, I think is primarily because Suicidy PD had previously said, we're going to hold, we're not going to stop him. But then, Tischer confirmed with his superiors, no, go ahead and make the stop. And as you say, Tischer was preparing to make the stop, would have made the stop, but Mr. Spratt yielded because of the cars behind him coming to a stop on his own. Setting aside Tischer, though, the other officers there had either reasonable suspicion for all of the past robberies fashioned by the attempted robbery, or in the case of the Sergeant Bluff Chief, he even saw a traffic violation. So, you have reasonable suspicion for the Salix robbery, probable cause for the traffic stop violation, and then when you add to that the fact that you have the suspicions, the probable cause for the three previous robberies, this stop is clean. If it weren't, you have inevitable discovery. And boy, it's rare to see a half-written search warrant. That search warrant was ultimately obtained, not just for the defendant, but for the car. They knew Spratt was the suspect. They had identified his car. The district court didn't rule on that, right? Correct. So, we wouldn't. If I win, the issue is removed. Yes, Your Honor. And if you lose, then that may be remanded to take up your alternative. I survive for quite another day. Yes, Your Honor. I wanted to talk about the intrinsic-intrinsic argument here, even though colleague didn't touch on it. In the briefing, I worry that there's a confusion about what grounds the government advocated for admission of these two other robberies that happened in the same time frame during the same crime spree. The government argued, alternatively, these two other robberies was intrinsic and also, if it were extrinsic, it would be acceptable within 404B. So, the court ruled that it was intrinsic, these two. I didn't win them all, but the two that I got in, the two commercial robberies that I got in, they were only outside of the case because they're on the wrong side of the river. They came in as intrinsic evidence. The judge also, the district court also said, alternatively, it would be 404B. But it's a crucial distinction because, of course, the defendant quite rightly points out that it looks like we're arguing propensity. Well, it was admitted as intrinsic evidence. Those subsequent acts of robbery, even though uncharged, were necessary and helpful to prove, not necessary, but helpful to prove the charged offenses, the felon in possession offense, and also the other robberies. So, again, it's important that that information came in as intrinsic to the case, not just as 404B. But intrinsic seems to be something, you kind of pulled back on the word necessary, but something that's really part of the crime, the offense that is being charged such that the jury can sort of understand it all. And I'm not really sure how the fact that you're alleging that he is the man who committed two other robberies helps them understand sort of the concept, this idea of these other robberies. I'm struggling with the intrinsic part. It's a great question. And, first of all, you caught my reservation there when I said not necessary. I say that, however, only because I want to preserve my harmless air argument. Even if the government would not have gotten these two other convictions in, the government still wins because the case is overwhelming. Now, to answer your question very directly, among the charges here is felon in possession. And how do you prove felon in possession? You have to show physical control over the thing. Well, where he's using that physical thing to rob stores, that's evidence of that crime. Yeah, and you charged that felon in possession. You had a wide date range. Did you not? Yes, Your Honor. So how does the proof go on that? So one juror could say he possessed it on day one, another on day eight. So do you get my point? I do. Yeah, if it's a felon in possession in such a broad range, I don't know. I've never come up with that. But it dovetails into your intrinsic argument. And I was struggling with that. We know that possession can be longer than a single day. We know that from our own experiences in the case law. Whether or not you could have implicit disagreement by a juror about when the weapon was possessed, it's a question I'm not fully prepared to answer today, frankly. But I would say that not just was the two other commercial robberies intrinsic in the government's opinion to the possession of a firearm by a felon, it's also intrinsic to the raft of other robberies. And there, perhaps, I take the judge's disagreement a little bit. But it is important for the government to show that this same offender with a car consistent with Mr. Spratt's and a gun consistent with that found with Mr. Spratt's DNA on it, and has a basic consistent physical appearance, is the same robber in all of these. That then shows not only his identity, but his signature. It shows that- That sounds like 404B, not intrinsic. And I certainly marshaled it for that reason, Your Honor. You'll see in the brief, I argue both. But it is intrinsic because it's the same crime spree. And this court has dealt- Yeah, it's just such an unusual fact pattern. Because normally, even though the standard is the jury has to find by preponderance of evidence that we'll call it the prior bad act or the 404B evidence occurred, usually it's a prior conviction that's sort of easier to prove up. But here, it's sort of all the same. And so it's like if they found- And I understand he was acquitted on one. And I get that. But it challenges my appreciation of this standard of preponderance of evidence of a prior act to prove by beyond a reasonable doubt that you committed the offense of conviction, if you get where I'm going. Absolutely. So two things. That's always the case. The only thing the government has to prove beyond a reasonable doubt are the elements. No, and I get that. That's always the case. It's your proof on the 404B evidence. We'll just call it that for these purposes. It's kind of the same evidence as for the offense of convictions. And it just sort of came in such a different shape and form in this case that it really challenged my appreciation of, well, what is this 404B versus intrinsic? So three things. First of all, forgive me for repeating myself just a bit. Just like the government would have to prove by a preponderance or something that the person owned the house to show that the things in the house were his, if we're trying to show a possession, you know, a constructive possession of the house, it's not entirely unfamiliar to have some facts within the record that have to be proved beyond a reasonable doubt and others not. But then additionally, the fact that it is same, as you said, Your Honor, it's so similar, it's so same. That's why to deprive the jury any one piece of it would really be to create these artificial gaps. The defendant committed a crime spree, each one very, very similar to the others. That crime spree is evidence of the individual acts. And the sameness that you are looking at and say, well, boy, that's not like what we typically encounter, that sameness is why it was so crucial to define this as intrinsic and let the government tell its case. And the third thing is, it's uncommon, and I forget off the top of my head, but it's in the brief. There's a Seventh Circuit case where I think there's a series of bank robberies. So it's unusual, but it's not entirely unique. So for all those reasons, the district court was right about it being intrinsic. Even if he weren't, it would be 404B. But again, I should win on the intrinsic, not just save the issue for another day. On the counts three through eight insufficiency issue, the defendant's main brief argues that the discrepancy, as I understood it, the discrepancy in the cell phone tower information in the time of the Sioux City robbery means there was an inconsistent verdict. And the government's same-person theory is that there was an inconsistent theory for all counts fails, and I didn't see a response to that in your brief. I think I responded, but let me be more clear in my response. First of all, they're not inconsistent merely because the strength of the evidence for one set of offenses is stronger than the other. So I lost the first count. That count was more aggressive than the others. Losing a more aggressive count than the more secure counts doesn't make that verdict inconsistent. That's my first response, and I think that's in the brief. Second, I don't get to appeal acquittals. So he shouldn't be able to use an acquittal now as a bludgeon against the rest of the case. And I think that's what Wise Carver says. I thought it was an evidentiary argument, not what you're responding to. Agree to disagree. If he is arguing evidentiary, his argument fails even before it starts. Because then all he's arguing is that the jury should have agreed more broadly with him than he did, and to say it out loud defeats it. A jury, of course, is entitled to credit some explanations and not others. It's within their prerogative. That's why we have juries. I didn't win count one. The government did win count one. That has nothing to do with whether or not the government put on three through eight. So if it's an evidential argument, he fails. But again, I would say, internally inconsistent verdicts, just not the case here. There was different evidence marshaled for each one of these episodic crimes. And then also, he should be precluded from even making this argument based on Wise Carver. The real question is whether there's sufficient evidence for the other counts. It doesn't matter what he was acquitted of. Exactly right. I don't understand why it's relevant. This might have been a merciful verdict. He might have got it wrong. We don't know why. But even if the evidence was exactly the same, it still wouldn't matter, it seems to me. As I have demonstrated in my 15 minutes, I could not possibly say it better. That's exactly right, Your Honor. It doesn't matter. The jury split the verdict. It happens. Each count was supported by independent evidence. It was an episodic crime. And by the way, just as I leave here, the evidence that the trial counsel did an adequate job to the extent it's established by the record, and it's not fully established, so this court shouldn't engage in it. But the court might take comfort in the fact that I was unable to get all of my relevant conduct in. The district court denied it. And I didn't win every count. This is not a case where the jury was out of control or the district court was just winking at the federal prosecutor. Not the case. The government won a contested case defended by multiple defense attorneys, and the jury verdict should not be disturbed on appeal. Unless there are questions, thank you, Your Honors. Thank you. Mr. Roth for rebuttal. I note that you rested on the briefs on the 404B question, but it's been opened up, so it's available for rebuttal. Yes, Your Honor. And I was going to address some arguments about the intrinsic evidence question. As I do note, it was brought up in the government's brief. The government had argued, essentially, that the evidence was intrinsic to the case and necessary for, first of all, the firearms offenses, the felon in possession offenses. I know Judge Kelly had questioned the government about that. Again, it's our contention there wasn't a relevance or intrinsic value to those offenses. I mean, Mr. Spratt had filed a suppression motion to keep that gun out. It was denied. The government was allowed to bring that gun in, including DNA evidence. So to say that they need these other robberies to show Mr. Spratt possessed that gun, I mean, there's just no probative value for that. As far as the robbery offenses, I believe the government argues that, you know, they need these uncharged offenses to show a scheme, or in the government's words, a crime spree that happened. Again, we believe the government had four charged robberies that they were able to present. And so, again, those offenses, the uncharged offenses or robberies, had no probative value in this case. And, you know, it goes to the argument they're really not relevant or intrinsic, but I think it also goes to the argument that, really, they're way more prejudicial or substantially more prejudicial than they are probative. So, again, we believe that, you know, the government should not have been allowed to present those prior bad acts or the uncharged robberies. And, yeah, in regards to the 404B evidence, it's kind of the same argument. You know, that we put in our brief. We believe the reasoning to bring in the 404B evidence was really more veiled as propensity evidence. But, again, at the end of the day, we believe the evidence had little probative value in relation to the case. And, your honors, I believe I covered all the arguments. I wanted to, if there's no questions, I would rest. Thank you. Thank you, counsel. Case has been well briefed, well argued, arguments helpful. A lot of issues, we'll take it under advisement.